25-4013, and I know I'm going to butcher the appellant's name, so I'll say it anyway. Szymakowski v. Utah High School Activities Association 25-4013. Council for Appellant, you can correct me on the name pronunciation and then proceed, please. Sure, Your Honor. I think you were quite close. My understanding is Zachary Szymakowski, but in any event, I'm Craig Perry, and I represent the appellants and defendants below the Utah High School Activities Association and its board of directors. Now, this case involved a high school sports and two students who are restricted from varsity competition. The emotion of the rush to let an Australian punter play one game led to a decision that the UHSAA was discriminating against foreigners. With no such finding by the district court, appellees nevertheless devoted entire sections of their brief to arguing that the rule emanates from xenophobic animus and fails rational basis review. The mere fact that appellees found such positions worthy of two sections of their brief perhaps tells us that even they think rational basis standard is the correct adjudication. And that is what the UHSAA seeks here. We ask the court to reverse the district court's decision and remand the case for further proceedings consistent with the appropriate standard of review. Just to clarify, if we think that the district court incorrectly applied strict scrutiny but should have applied intermediate scrutiny, you lose because your position is only rational basis can we support? Well, our position is that rational basis is correct. Now, the court. I'm asking if we disagree with that. What is the result? Well, if if you would agree that strict scrutiny applies, then I think you just affirm the lower court. What about intermediate scrutiny? Yeah, it's a little bit more complicated because the court held that it applied strict scrutiny. And that's what it said. I understand. And there was also statements that said the record does not show that the rule survives heightened scrutiny, let alone strict scrutiny. I'm just asking, I read your brief as just basically arguing only that you survive only if we agree with you that it's a rational basis standard. I think even if you were to apply a heightened scrutiny of intermediate, that it should still be remanded because I think it was more in in passing and dicta that the court said, I don't even think it would be intermediate. So, I still think the court should make findings that say this fails intermediate. But clearly, if you feel strict scrutiny is appropriate, then that's the end of the. Okay, and by court making findings, you're talking about the district court, right? Yes. Yes. No. Yeah. Okay. All we're asking this court to do is determine the level of scrutiny and determine whether or not it and we're asking that it does not violate. It's not preempted. Doesn't violate the supremacy clause. And so I think 1st, I'll turn to the supremacy clause and just give you an overview of our arguments there. The lower court and appellees almost exclusive reliance on 1 sentence from the decanus and toll case that any state enactment that imposes a burden on aliens, not contemplated by Congress is preempted, is misplaced. Neither of those cases purports to create a new category of preemption, what appellees seem to call the additional burden. Indeed, the analysis of both of those cases frame the additional burden analysis in terms of a conflict between state and federal law, which is, as the court knows, along with express preemption and filled preemption are the 3 types of preemption recognized by the Supreme Court in this circuit. No case, neither toll nor decanus that includes that statement they rely on, concludes its analysis with a simple determination of whether state statutes constitute an additional burden. So this is a conflict preemption case. And as this court held in the chote case in 2000, conflict preemptions are when it where it is impossible for a private party to comply with both state and federal requirements or where state law stands as an obstacle to accomplishment and execution of the full purpose and objectives of Congress. And this court continued in that case, conflict preemption requires that the state or local action be a material impediment to the federal action or thwart the federal policy in a material way. Now, the law affecting a F-1 visa student's participation in the extracurricular activity of varsity sports does not conflict with federal law. Federal law on F-1 visa holders says nothing about participating in extracurricular activities. Rather, an F-1 visa provides non-immigrant aliens the right to temporarily enter this country solely for the purpose of pursuing a full course of study, which the regulations define as study in a curriculum to consist of class attendance for a number of weeks to make normal progress towards graduation. And the ordinary meaning of curriculum is the course is offered by an educational institution. Participation in extracurricular activities, including varsity athletics, is simply not part of the congressionally defined course of study. The word extracurricular itself denotes that it is outside the curriculum. The second point is on equal protection. In the last last summer's holding by the Supreme Court in Skirmetti, I believe, ends the discussion about whether F-1 visa rule classifies on the basis of alienage and is therefore subject to strict or heightened scrutiny. The UHSAA rule classifies on the basis of visa status, not alienage. Well, isn't that just trying to play with the words? No, it's not because it's... F-1 is only for aliens and the educational experience clearly includes extracurricular activities, whether it's specifically said or not. And to say that we're going to keep all foreigners out of here who have F-1 visas is clearly, as one of your coaches said, I want to be able to read the names of the players. That was the big problem. Well, two things. One is in Skirmetti, as this court knows, the only people affected by the law were transgender youth. Not even closely analogous. But in this case, the only people offended, excuse me, the only people affected by the law are aliens. Foreign aliens. F-1 visa students. That's right. And in the Galdug case, yes, and in the Galdug case from California, the only people affected by the law were women. But the court in Galdudig and the court in Skirmetti said that because there's not an identity of interest in other words, they're in the California welfare case that denied welfare benefits to certain pregnancy conditions, the court said that the law created two classes of individuals. Pregnant persons and non-pregnant persons. And because women were in both groups, it was not a law targeting women and therefore rational basis applied. In Skirmetti, the law, even though the law affected only transgender individuals, there were, there was, there was transgender individuals seeking certain types of puberty blockers, and then there were all other people. And transgender people fell on both sides of the law. Therefore, there was no identity of interest and therefore it did not classify on the basis of sex. In our case, you have one group that is F-1 visa students and the other group is all other foreign students. J-1s, H-1s, everyone else is not affected by the rule. So you have aliens on both, in both classifications and under the Supreme Court holding that the conclusion of that is that the law does not classify on the basis of race, on alienage, excuse me. Well, this is, as far as I'm concerned, you're taking on the high school students and you're saying that because you're from out of the country and you're here on an F-1 visa and you kick good field goals, we're going to prevent you from playing. To boil it right down to the nitty-gritty. Well, that, that, that might, that might be. There's not field goal kickers on both sides. I'm sorry, but I understand what you're saying but to me that just gets to the analysis. Is there a rational basis for this? Is there racial animus? That's the rational basis. Is that you want to win more games without foreign students on the other team? No, because there are many types of foreign students that this rule doesn't even affect. Oh, yeah, those that don't play any sports. No, this rule affects only one type of visa holder that is, that is particularly susceptible to being recruited. And so can you precisely tell us what the rational basis is for this law that? The, the, the rational basis is that it, part of the association's goal for the past hundred years is to, is to create a level playing field and equal opportunities for, for people to play. F-1 visas, because they allow a school to reach out to a foreign individual, entice him to come to the school and immediately play sports and play sports through the remainder of his career, make those, that situation susceptible to recruiting. Whereas other students like H-1s, J-1s and others they can't be recruited because they can't pick their, their school. Why isn't it still, why isn't it? I thought I heard you refer to a level playing field. Why isn't it still a level playing field? Every school in Utah that's within the scope of your organization can recruit, right? Why can't they recruit like anybody else? Well, because recruiting is forbidden by our rules. So we're trying, this is a, this is an enforcement mechanism to try and ameliorate recruiting, but it's also a difference between private and public schools. Public schools can only have an F-1 student attend for one year. Private schools can have them attend until graduation. And the other, the thing to keep in mind, this does not prevent them from playing sports. It just puts conditions on their varsity eligibility. They can play a sub-varsity. Most kids who go to high school don't have the opportunity to play varsity sports for one reason or another. Academic eligibility. Yes. Who are you? Who are you trying to, who are you trying to create a level playing field for? Well, it's just for all the, non-aliens? No, it's, it's for them too, because like I said, that aliens are allowed to, to play. And in fact, J-1 aliens have fewer restrictions than local students. If a J-1... If the schools are going to recruit, which I understand is prohibited, but, but you're suggesting that's what they're doing and you're trying to enforce it in this way, don't they recruit, don't private schools recruit all the time from out of state? They get somebody to come move into Utah and, and bring their family there and, and and then they've got some out-of-state folks that aren't, you know, aren't Utahns either. I mean, I'm just wondering who it is you're trying to protect in this level playing field. Well, we're, we're trying to, again, this is the rational basis analysis, I think, that should be conducted by the district court, but... Are you trying to protect the public schools? We're trying to... Private schools? Because private schools, if they're recruiting, I mean, they may be recruiting from a lot of places, not just F-1 visas. No, they, they are, and, but it's, it's a purpose, a goal of the association to minimize, to deter recruiting, to keep... To be, I'm sorry, go ahead. No, to keep athletics in perspective in, in regards to the other functions of, of, of a high school, to avoid... Well, my point is just how will this keep them from recruiting from, you know, other states, other, other locations, even within this country? How does it, how would it possibly go to, go to any other recruiting besides this recruiting? Well, it doesn't. It addresses the same type of recruiting. So how does it really create a level playing field, which was the one interest that you cited, or basis that you cited? Well, I don't have time to explain all the harms of, of, of recruiting. I mean, level playing field, I guess, is, is, is one, but it's also in the way these recruits are treated when they come here. There was evidence before the district court of their mistreatment that was acknowledged by both the judges. It's, it's, you know... So rather than have mistreatment, you just won't let them play at all? No, they're allowed to play. There's just restrictions on them. Oh, but they can't, they can't be in tournaments and they have to get approval, right? They can't play at the varsity level. They can play at the sub-varsity level, or the school can choose to go independent as schools have chosen, or they can choose not to play in a state tournament. So it, it does restrict them, but it doesn't prevent them from playing. And Mr. Perry, let me make sure I understand the relief that is being sought here. What, what, beyond the preemption issue, you know, let's say we find that, that, that this, the, that this particular provision is not preempted, okay? Beyond that issue, you would, you would just seek our determination that this is not subject to strict scrutiny and then send it back to the district court. Is that right? Or should we? Go ahead. Seek a determination that it's subject to rational basis. Okay, and rational basis, and then send it back for the court to work out the rational basis analysis. Yeah, let them work out all these questions you're asking about whether it's, whether it makes sense, whether there's, you know, other ways to do it, to, to, within the rational basis analysis. That's all we're asking this court to do. Okay, I just want to be clear. Thank you. Okay, thank you. We'll hear from Applee. Please proceed. Thank you, your honors. May it please the court. Yeah, please go ahead. May it please the court. My name is Tanner Camp from the law firm of Foley and Lardner. I represent Zachary Shimakowski and Joanna Uribe on behalf of her son Felipe Uribe. If the UHSAA gets its way, no F-1 student attending high school in Utah will ever play in a postseason game, stand on a championship podium, or hold up a championship trophy. Fortunately, the Constitution prevents the UHSAA from getting its way. As this court knows, there are two issues here, preemption and equal protection. With respect to preemption, plaintiffs are likely to succeed because the UHSAA admitted that the rule imposes burdens upon F-1 students beyond those imposed by Congress. With respect to equal protection, plaintiffs are likely to succeed because the rule is subject to at least heightened rational base, or excuse me, at least heightened scrutiny, and it fails under that standard. Well, we can start with preemption and opposing counsel pointed out that we have a long history of we and the Supreme Court have defined what preemption means and there are three categories of preemption and the one is not added burden. And so why is that enough that there's an added burden if that added burden is not deemed to be within the  grounds for preemption? Your Honor, I agree with opposing counsel that those are the general categories of preemption and when you're talking about preemption generally and whether federal law preempts state law. However, none of the conflict preemption cases that opposing counsel cites in their brief deal with regulations that discriminate based on alienage. And we have a direct case from the Supreme Court that does deal with state regulations discriminating on the basis of alienage and that's what and this is what that case said. This is the Tolby Moreno case. Quote, state regulations not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress. End quote. I understand that that opposing counsel wants to draw back to other areas of preemption law that don't directly deal with state regulations burdening or discriminating on the basis of alienage, but the Supreme Court has told us what the burden is here. And that makes sense, Your Honor, because immigration and naturalization dealing with aliens, that is a an area of law that is constitutionally granted to Congress. And so when you have a state regulation that is discriminating on the basis of alienage and that imposes additional burdens that Congress didn't envision or impose, that is preempted. Well, any burdens or how severe do the burdens have to be? What are we talking about? What renders it unconstitutional or preempted for a better word? Right. I think that the best way to answer that question is to turn to Tolbi Moreno itself, Your Honor. And there we had G4 visa students or excuse me, G4 visa holders and the court there said that Congress had not imposed domicile restrictions on that set of visa holders, right? And in fact, Congress had contemplated that they would be able to be domiciled, right? Contemplate that they would be able to be domiciled by not imposing restrictions on them. That is exactly the case here, Your Honor. Well, but hit the pause button. The language of that case spoke of what Congress contemplated and what it contemplated was that they would be able to be domiciled somewhere in order to fulfill the purposes of the visa. Is that not right? Your Honor, I don't think that's exactly right because I think what happened in in Tolbi Moreno is Congress put restrictions on other types of non-immigrant aliens and said that they could not  the domicile requirements. It did not put those same restrictions on holders of G4 visas. It was silent on that issue. That's the same thing that we have here, Your Honor. For F1 students, Congress has allowed those students to enter into the country to study at a high school if they meet certain conditions. Those conditions being they have to speak English reasonably well. They have to pay their own way. They have to intend to return to their home country when they're done. It says pursue a course of study and it does say nothing about extracurricular activities. And so why should one assume that in some sense that is not that the states are not left as they are on most things in educational matters to decide how to address that? Well, Your Honor, I think that when you're saying to pursue a course of study, that's correct. They are admitted to pursue a full course of study. But that doesn't mean that they are disallowed from participating in all the other types of aspects that are part of the high school experience. Does Congress really care whether I can do debate team as the F1 visa holder? I mean, why is that a matter that relates to my course of study? I think that, Your Honor, the fact that Congress did not preclude these students from being able to participate in those activities shows that, yes, they intended that those students should be able to participate in every type of opportunity that domestic kids can participate in in high school. And, Your Honor, it's interesting to note where would it end? If a state can preclude students from participating in high school athletics, can they stop these students from going to lunch? I recall that example. And let me say that that whole question raises another whole constitutional issue. I mean, there are a whole range of constitutional issues that could arise if they stop some kids on the grounds of alienage from eating lunch and those sorts of things. And that's not what we're here to talk about now. What we're talking about is whether this particular provision would be preempted, right? And the answer to that, Your Honor, is that, again, Congress did not say anything about this. And, in fact, if you look at appellants cite the regulations that deal with J-1 visa holders, for example, saying that those students, the regulations say that they can participate in athletics, that's not exactly what those regulations say. Those regulations, and there are much more of them with J-1 students, they say that they can participate in athletics if allowed to do so by the school district and by the state athletic association. The fact that they did not put that type of restriction on F-1 students suggests that they actually didn't want to have any restriction on F-1 students for playing and doing athletics and other extracurricular activities. And that's because F-1 students are closer to regular domestic attending high school students. J-1 students are limited to two semesters attending school. And so it would make sense that Congress would have those different regulations. Mr. Camp, let me just ask two clarifying questions. One, so are you saying that the traditional framework for preemption does not apply here? I mean, in other words, are the conflict preemption cases irrelevant to analyzing your claim? I don't know that I'd go as far to say they're irrelevant, but I would say that we have a more specific case that gives us our direction and that's Tolby Moreno. So you stand or fall on Tolby Moreno then? Well, Your Honor, whether you would like to call Tolby Moreno a conflict preemption case or not, whether those labels matter, I can't really say. Oh, they matter. Historically, they matter. So what I'm trying to understand is would we be offending your claim if we looked at, at least for guidance, the traditional conflict preemption cases in deciding whether you win or lose? I guess I would say I don't think those cases will be very helpful because, again, appellants have not cited any of those conflict preemption cases that are dealing with state regulations discriminating on the basis of alienage. And that leads me back to my initial question then. Are you saying that if we don't find that Toll allows you to win, then you lose, right? Are you standing and falling on Toll then? I think that Toll, yes, I think that Toll provides the preemption standard for our situation. That's correct. Then the other clarifying question, a little less complicated maybe, is on the fundamental rights area and in terms of whether there is heightened scrutiny here, one thing that I wasn't clear about in the briefing is, are you saying that there's, well, is the issue, is there a fundamental right to play varsity sports or is there a fundamental right to play post-season varsity sports? What are we talking about? I don't think we frame it in terms of fundamental rights, Your Honor. It's a fundamental right not to be discriminated against on the basis of alienage. Well, the issue is what's the impact? I mean, what's the impact in terms of what are you being denied the right to do? And that determines whether there's discrimination on the grounds of alienage. And so I'm not trying to make light of your claim. I'm just trying to understand because, you know, because, I mean, theoretically the F-1 visa holders can play varsity sports. They just, they would forfeit any right to play post-season varsity sports. So is the ground of concern or grievance the impingement of the ability to play post-season varsity sports? Or is it varsity sports generally because the schools will just not let you play if you're going to have that impact on their team? I think it's the latter, Your Honor. This forces them into a Hobson's choice, right? A varsity team into a Hobson's choice to choose. Okay, are we going to let this F-1 student play on our team? Which would force our entire team to forfeit post-season play? Or are we going to just say, you know what? It's not going to work out. We're going to have to go forward because it wouldn't be fair to the rest of the kids on our team. And functionally that excludes all F-1 students from varsity play. Got it. Thank you. Now I want to return back to something that Judge Moritz asked Mr. Perry about. If we disagree that rational basis applies, you lose. I want to correct something. The court, the district court did find that strict scrutiny is the correct level of scrutiny. However, the court applied intermediate scrutiny. It applied a heightened scrutiny and found that under the heightened scrutiny, the law fails or the rule fails. And that's important to remember. So let me just talk a little bit more about the equal protection. State classifications based on alienage like those based on nationality or race are inherently suspect and subject to close judicial scrutiny. Now in the alienage context, the Supreme Court has recognized two exceptions. The exceptions that don't apply here. A political and government function exception and regulation of aliens not lawfully admitted to the United States. State classifications that fit under those exceptions are not subject to strict scrutiny. As this court knows, there is a circuit split regarding the existence of another exception. The regulation of non-immigrant aliens. But the Supreme Court has never recognized this exception and neither did the district court. Like I said, it applied a heightened level. It's a pretty lopsided circuit split, isn't it? I mean you have one case, I think the circuit, second circuit and everybody else on the other side in terms of how they deal with non-immigrant aliens. Isn't that right? I wouldn't think it's as not as lopsided as the other side has proposed it to be. First, they claim that it's the 6th circuit, 5th circuit and 11th circuit on one side versus the 2nd circuit on the other side. The 11th circuit case really isn't applicable here, your honor, because there it was dealing with DACA students or those who are not lawfully admitted into the United States. It falls into a recognized exception within the Supreme Court analysis. DACA students have a legal status though, do they not? Well, the students in that case in the court went to say that they were not aliens who are here lawfully admitted. What do you do with the Scarametti argument then? I mean the reality is that the argument would be anyway, and the one articulated by opposing counsel, is this cannot be discriminating on the class of alienage since there are F-1 visa holders on one side and there are all other aliens and citizens on the other side. And so how can that be a discrimination based upon the class of alienage? So I think that what's most telling about opposing counsel's argument is what he did not cite. And that is Nyquist versus Moslet, a Supreme Court case that is directly on point and dealing with alienage again. There was a New York law that barred certain resident aliens from state financial assistance for higher education. And the state there argued in part that the statute did not classify based on alienage because it distinguished only within heterogeneous class of aliens. In other words, it did not distinguish between citizens and aliens. And the court rejected that argument and it said this, you classify based on alienage when the regulation is directed at aliens and that only aliens are harmed by it. The fact that the statute is not an absolute bar does not mean that it does not discriminate against the class. End quote. That clearly shows that this is discrimination classification based on alienage. These other cases dealing with sex, the intersection of sex and medical conditions are not applicable, Your Honor. All right. I think the time is up for both of you. Oh, no, no, if you have a question. Well, I just wondered if you could address Plyler, the Plyler case where the Supreme Court applied an intermediate scrutiny to a case involving undocumented children. Does that impact your analysis at all as far as what the minimum level of scrutiny might be here? Yes, Your Honor, I think it does. I think it's an important observation distinction to make. As Your Honor said, in Plyler, the court applied a heightened form of scrutiny when dealing with a class of aliens who are undocumented or here illegally. Now, this is something that the Second Circuit pointed out with the absurdity or the irrationality of what the Sixth and the Fifth Circuits have done because they've applied a lower level of scrutiny to regulations that are discriminating against lawfully admitted aliens here on a temporary basis. But at issue in Plyler was the right to be educated at all. I mean, it seems to me that's different than the right to than any sort of claimed right to play football. I mean, and during play varsity sports. I mean, those are two different things, aren't they? I mean, it's the question. What is the deprivation? I mean, what are you being deprived of, right? Well, Your Honor, the UHSAA itself says in their handbook that these high school sports and extracurricular activities are essential to the high school experience. That's the words that they use, essential to the high school experience. And yet they're denying something to these F-1 students that they claim to be essential to this experience. All right. Thank you. Any more questions? All right. Thank you, Counselor.